So Ordered.

Dated: March 4, 2025



G. Michael Halfenger
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Joshua Patrick O'Keefe,                    Case No. 23-21043-gmh

Debtor.                                    Chapter 7

Timothy Horton,

Plaintiff,                     Adv. Proc. No. 23-02072-gmh

v.

Joshua Patrick O'Keefe,

Defendant.

**OPINION AND ORDER**

A confrontation between Timothy Horton and Joshua O'Keefe left Horton seriously injured. Horton seeks a judgment that O'Keefe—who is a chapter 7 debtor—owes him a debt for willful and malicious injuries that is excepted from discharge by §523(a)(6) of the Bankruptcy Code.[1]

The court held a bench trial. This opinion states the court's findings of fact and conclusions of law.[2] See Fed. R. Civ. P. 52(a)(1) (applicable here by operation of Fed. R. Bankr. P. 7052).

I

A

On the evening of Saturday, April 16, 2022, Timothy Koellen, a partial owner of a commercial property located at 189 Village Line Road, Sullivan, Wisconsin (the "Property"), was notified that someone had triggered one of the trail cameras he had deployed there. Koellen wasn't in the vicinity, so he sent a Facebook instant message to Horton, who lived nearby.[3] Ex. 9, at 2.

Horton was home watching a movie with his family when he received the message. The message, which arrived around 7:30 p.m., included a trail-camera photo of a person in a neon-yellow hooded coat with reflective striping. *Id.* Koellen's message

---

1. Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Code, title 11 of the United States Code.

2. Sections 157 & 1334 of title 28 and the district court's order of reference give this court jurisdiction over this dispute. See https://www.wied.uscourts.gov/general-orders/order-reference (last visited Feb. 26, 2025). This is a core proceeding under 28 U.S.C. §157(b)(2)(I); there is both statutory and constitutional authority to enter a final judgment. Neither party disputes this.

3. Horton didn't know Tim Koellen well. After Koellen and his co-owners purchased the Property, Koellen had approached Horton about mowing the lawn. Koellen had also asked Horton to check on the Property one previous time, after some copper wire had been stolen.

asked whether Horton had "see[n] this guy". *Id.* Horton replied that he hadn't but would "keep an eye out", after which Koellen added, "Pretty strange guy has his hood on". *Id.*

As dusk approached, Horton decided to go check things out. He drove over to the Property and down the sole access road to the Property's commercial building. Finding a pickup truck with an attached trailer near the building, he parked his SUV immediately in front of the truck, blocking its exit and allowing his dash camera to record events in front of his vehicle. No video from that camera was preserved, however.

Horton saw a person outside the building. Rather than call law enforcement, he got out of his vehicle and confronted the suspected thief.

B

The person Horton confronted was Joshua O'Keefe. But O'Keefe wasn't a thief. He was there to pick up a toolbox and a parts washer that he had purchased a few weeks earlier through an online auction. The auction had been managed by Tyler Koellen, Timothy Koellen's brother and one of the Property's other owners. Tyler had told O'Keefe that he would leave O'Keefe's purchases outside of the building on the Property, so that O'Keefe could pick them up later that night. But O'Keefe was unable to retrieve them that night. Tyler left the items outside, giving O'Keefe license to pick up them up later, but cautioned O'Keefe that he assumed the risk that his purchases would be damaged or stolen.[4] In all events, there is no dispute that O'Keefe owned the

---

4.    Tyler and O'Keefe disagreed in their testimony as to whether O'Keefe could pick up the items whenever he wanted. I find O'Keefe to have been more credible based on my observations of the witnesses' demeanor, but neither party argued that it matters one way or the other.

items he was picking up at the Property when Horton confronted him.

O'Keefe had arrived at the Property about half an hour before Horton. The Property's access road has one entrance, so he backed his pickup truck and attached trailer down the road to the outbuilding. He found his toolbox and parts washer outside the building and began moving them to his trailer. He soon discovered, however, that the parts washer contained about 10 gallons of solvent, making it too heavy to load.

O'Keefe tried to call Tyler to ask about removing the solvent. Unable to contact Tyler, O'Keefe located a couple of discarded five-gallon pails and began scooping solvent out of the parts washer and into the buckets. This took a while. Before he had completed the effort, Horton pulled in.

C

O'Keefe and Horton were the only witnesses to their confrontation, which mostly occurred outside of the trail camera's field of view. And Horton has no recollection of any events that transpired after he arrived at the Property. Thus, all testimonial evidence about the events that transpired after Horton parked his vehicle comes from O'Keefe who, at least about the principal events, was credible. The following factual findings are based on O'Keefe's testimony and the documentary evidence, including images from one of the trail cameras.

As O'Keefe was attempting to empty the parts washer, Horton sped down the access road in his SUV and parked directly in front of O'Keefe's truck, which was backed up to a three-and-a-half-foot sand pile on the other end. Ex. 101, ECF No. 60, at 4. Horton exited his vehicle and walked along the driver's side of the truck directly toward O'Keefe. When Horton got about 15 feet away from where O'Keefe was emptying the parts washer, he began accusing O'Keefe of theft. Horton told O'Keefe

that he had caught him red-handed and that O'Keefe wasn't going to get away this time. O'Keefe asked Horton who he was. Horton, continuing his accusations, refused to identify himself other than to say he was a neighbor. O'Keefe told Horton he had purchased the items. Horton, who said he was on the phone with the Property owner, rejected O'Keefe's explanation and accused him of lying. Horton proclaimed that he was there on behalf of the Property owner to prevent theft.[5]

After several minutes of debate with Horton, O'Keefe went back to removing the solvent from the parts washer so he could load it onto the trailer and get ready to leave. Horton then told O'Keefe that other people were on their way who would make sure that O'Keefe got his comeuppance for attempting to steal from the Property, repeating again that he had caught O'Keefe red-handed.

As O'Keefe continued his efforts to empty the washer, Horton came straight at him, and when he was within two feet, thrust his phone into O'Keefe's face to display photographs of O'Keefe and his license plate. Horton withdrew and then repeated the tactic multiple times: advancing to within a couple feet of O'Keefe, calling him a thief, and showing him pictures of the scene, which he declared to be proof of the theft.

O'Keefe didn't know quite what to make of Horton's conduct and was unsure of his motivations. O'Keefe testified that he found Horton's brazen demeanor unusual—"euphoric"—as if Horton believed he was "bulletproof". O'Keefe attributed that attitude either to Horton's confidence in his own fighting prowess or being armed.

---

5. While confronting O'Keefe, Horton also sent Tim Koellen a Facebook instant message containing two photographs—one of O'Keefe and one of O'Keefe's license plate. Ex. 9, at 3. He also sent Koellen a message to call the sheriff. *Id.* Koellen did, reporting that there was a person he did not know on the Property.

Horton's manner, the possibility of a concealed weapon, and Horton's report that others were coming to assist him, left O'Keefe feeling threatened. He began considering ways to flee, concluding he might need to knock out Horton and ram Horton's vehicle to get around it and drive away.

At some point during their exchange, O'Keefe walked to the front of Horton's vehicle and acted as if he were taking a photograph of Horton's license plate, all of which was captured by one of the trail cameras. Ex. 101. O'Keefe pretended to take a photograph because he didn't have his phone—he had left it and his keys in his pickup after he attempted to contact Tyler Koellen—but he wanted Horton to believe he had done so because he thought that might persuade Horton to back off. Then, as Horton continued to berate him, O'Keefe tried to ignore Horton and instead returned to emptying the parts washer. O'Keefe then observed Horton reaching into O'Keefe's truck bed with his phone. O'Keefe became more concerned about Horton stopping him from leaving the premises, including the possible threat that Horton was armed or had friends on the way.

After Horton began reaching into the bed of O'Keefe's truck, O'Keefe approached Horton, positioning himself between Horton and the truck. Horton yielded little ground. Now practically nose to nose, they bumped. O'Keefe moved a bit to the side to create more space and, trying to maintain access to his vehicle, instructed Horton to move away. O'Keefe warned that he would use force if Horton persisted.

Rather than withdraw, Horton advanced. Horton moved forward, transferred his weight to his left side and lifted his right knee. To O'Keefe, trained in Taekwondo, this signaled an oncoming kick. O'Keefe's first instinct was to counterattack by kicking Horton. But recognizing the potential damaging effect of that counterstrike—his kicking

prowess had earned a younger O'Keefe a fifth-degree black belt—O'Keefe elected to counter with what he believed to be a less harmful response—a series of three rapid punches to the face.

After O'Keefe delivered those punches, Horton immediately fell to the ground unconscious. O'Keefe then went to his pickup to retrieve his phone and called for emergency assistance. When he returned to Horton after a couple of minutes searching for his phone, Horton was semi-conscious. O'Keefe waited for the ambulance and authorities to arrive at the scene.

Horton introduced the testimony of Jarred Gonzalez, a Jefferson County Sheriff's deputy who was the officer in charge of investigating the altercation. Deputy Gonzales testified that O'Keefe called 911 at 8:14 p.m. and requested an ambulance, reporting he had struck an assailant in self-defense. At the scene, O'Keefe recounted the events to deputies consistent with his trial testimony. The entire encounter—from Horton's first accusation to O'Keefe knocking him out—had only lasted about 10 to 15 minutes.

The ambulance took Horton to a nearby emergency room. He remained in the hospital for an extended period. He spent a week in intensive care, three days of which he was in a medically induced coma. He sustained a broken eye socket, five damaged teeth, and brain bleeds that caused loss of function requiring intensive rehabilitation. He was unable to work for four months and had to undertake almost six months of physical therapy.

II

A

To adjudicate Horton's request for a declaration that any debt O'Keefe owes him is made not dischargeable by §523(a)(6), it is first necessary to consider that provision's text and relevant precedent.

1

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity". While nonbankruptcy law (here, state law) governs the validity and amount of any debt O'Keefe may owe Horton, "the issue of nondischargeability" is "a matter of federal law governed by the terms of the Bankruptcy Code." *Grogan v. Garner*, 498 U.S. 279, 283–84 (1991); see also see §101(5) & (12).

Precedent instructs that "willful and malicious injury" consists of three distinct factual elements: "(1) an injury caused by the debtor (2) willfully and (3) maliciously." *In re Calvert*, 913 F.3d 697, 700 (7th Cir. 2019) (quoting *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013)); see also *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994) ("Whether an actor behaved willfully and maliciously is ultimately a question of fact reserved for the trier of fact."). "[T]he burden is on the creditor to establish these facts by a preponderance of the evidence." *First Weber*, 738 F.3d at 774 (citing *Grogan*, 498 U.S. at 287). None of these terms is defined by the Bankruptcy Code, but precedent guides their application. "The term 'injury,'" the Seventh Circuit has instructed, "mean[s] a 'violation of another's legal right, for which the law provides a remedy.'" *First Weber*, 738 F.3d at 774 (quoting *Weinstein & Assocs., Ltd. v. Lymberopoulos (In re Lymberopoulos)*, 453 B.R. 340, 343 (Bankr. N.D. Ill. 2011)). For an injury to be "willful", the injury itself

must be "deliberate or intentional [ ], not merely" the result of "a deliberate or intentional act". *First Weber*, 738 F.3d at 774 (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)) (emphasis omitted). And for the injury to be "malicious," "the debtor [must have] acted 'in conscious disregard of [his] duties or without just cause or excuse'". *First Weber*, 738 F.3d at 774 (quoting *Thirtyacre*, 36 F.3d at 700) (first alteration added).

2

These expositions create an analytical wrinkle because they make §523(a)(6)'s *factual* elements depend on the application of law, at least some of which is nonbankruptcy law. The court must first determine whether O'Keefe, who contends he acted in self-defense, injured Horton by violating Horton's *legal rights*. And if the court finds that O'Keefe did violate Horton's legal rights, it must then determine whether he did so maliciously—that is, whether he acted in conscious disregard of his *duties* or without *just cause* or *excuse*. To answer these questions, one must apply the law governing Horton's legal rights, the scope of O'Keefe's duties, and the existence of a just cause or an excuse.

In circumstances like those presented here, courts have diverged on whether and to what extent state-law self-defense principles govern whether an injury is malicious for purposes of §523(a)(6). See *Juett v. Casciano (In re Casciano)*, No. 15–8013, 2016 WL 105926, at *6 (B.A.P. 6th Cir. Jan. 11, 2016) (Section 523(a)(6) is governed by federal law but "the law on self-defense is an area where bankruptcy courts have looked to both federal common law and state law for guidance."); *Owens v. Powell (In re Powell)*, 567 B.R. 429, 438 (Bankr. N.D.N.Y. 2017) (citing New York criminal self-defense law); *Vyshedsky v. Soliman (In re Soliman)*, 539 B.R. 692, 701–02 (Bankr. S.D.N.Y. 2015) (examining self-defense under federal common law and New York law); *Est. of Sustache*

*v. Mathews (In re Mathews)*, 433 B.R. 732, 735–36 (Bankr. E.D. Wis. 2010) (applying Wisconsin criminal self-defense law to determine whether debtor injured the plaintiff maliciously), aff'd sub nom. *Est. of Sustache v. Mathews*, 452 B.R. 751 (E.D. Wis. 2011); *Kleman v. Taylor (In re Taylor)*, 322 B.R. 306, 309–10 (Bankr. N.D. Ohio 2004) (noting that "federal law controls the standard for nondischargeability under §523(a)(6), as well as the defenses thereto" but stating that "[r]eference" would "be made to Ohio [self-defense law to determine whether the debtor acted both willfully and maliciously] given the lack of authority, both controlling and persuasive, on the matter of self-defense as it applies to §523(a)(6)."); *Rolland v. Johnson (In re Johnson)*, 109 B.R. 885, 892–93 (Bankr. N.D. Ind. 1989) (applying Indiana self-defense law to decide whether debtor acted with malice); *Dutka v. Dilley (In re Dilley)*, 25 B.R. 179, 180 (Bankr. W.D. Wis. 1982) (applying Wisconsin civil law of self-defense to conclude that the debtor's "conduct which would otherwise constitute battery is excused" and thus "neither willful nor malicious as those terms are used in connection with 11 U.S.C. § 523(a)(6).").

Ultimately, whether a debt is excepted from discharge by §523(a)(6) is necessarily a question of federal law: Is the debt "for willful and malicious injury by the debtor to another [person] or to the[ir] property" within the meaning of that subsection? See *Grogan*, 498 U.S. at 284 ("Since 1970, . . . the issue of nondischargeability has been a matter of federal law governed by the terms of the Bankruptcy Code."). But by defining "injury" as "a violation of another's legal rights, for which the law provides a remedy," *First Weber*, 738 F.3d at 774 (internal quotation omitted), the governing precedent necessarily requires the application of nonbankruptcy law to determine whether O'Keefe's acts violated Horton's legal rights and, if so, whether the law provides Horton a remedy for such a violation.

Nonbankruptcy law plays a lesser role in determining whether O'Keefe acted maliciously—that is, "acted 'in conscious disregard of [his] duties or without just cause or excuse'". *First Weber*, 738 F.3d at 774 (quoting *Thirtyacre*, 36 F.3d at 700). Like proof of injury (as a violation of Horton's legal rights), proof that O'Keefe consciously disregarded his duties requires evidence that he violated his *legal duties* and that he did so *consciously*. The *legal duties* that O'Keefe had at the time of the claimed prepetition injury necessarily depend on nonbankruptcy law, but *First Weber* instructs that whether O'Keefe consciously disregarded those duties or acted without just cause or excuse—that is, acted with "malice" within the meaning of §523(a)(6)—are matters governed by federal law. 738 F.3d at 775 (noting that the state court judgment at issue in that case "precluded relitigation of the issue of maliciousness" because the state court's "inquiry substantially mirrored the federal test for maliciousness.").

In all events, the nonbankruptcy law that applies here is that of Wisconsin—the state in which the events took place and in which both parties resided at the relevant time. Indeed, neither party disputes that Wisconsin law governs any duty O'Keefe owed Horton and any privilege to which O'Keefe may be entitled based on the events at issue.

B

Horton failed to prove that O'Keefe maliciously injured him within the meaning of §523(a)(6) for the following reasons.

*Injury*. There is no question that O'Keefe harmed Horton: O'Keefe admits that he punched Horton in the face three times, causing him substantial physical damage. Based on that physical harm, Horton treats as established fact that O'Keefe injured him within the meaning of §523(a)(6).

Wisconsin law has long recognized the tort of battery and the commensurate duty not to engage in unpermitted physical contact. See *McCluskey v. Steinhorst*, 173 N.W.2d 148, 152 (Wis. 1970) ("If a defendant acts intending to cause contact and the contact is unpermitted, or as in this case, found by the jury to be excessive, it follows that the intent is also unlawful." (citing *Vosburg v. Putney*, 50 N.W. 403 (Wis. 1891)). But Wisconsin law also recognizes a privilege of self-defense—a "right to defend one's person by the use of whatever force is reasonably necessary." *Crotteau v. Karlgaard*, 179 N.W.2d 797, 799 (Wis. 1970) (quoting then-current Wis. JI–CIVIL 2006 as an accurate statement of civil self-defense law); see also *Maichle v. Jonovic*, 230 N.W.2d 789, 792 (Wis. 1975) (quoting *Crotteau*'s quotation of the civil jury instruction on self-defense); *Prochaska v. Rainiero*, 2009 WI App. 95, ¶14, 2009 WL 1406982, *4  (Wis. Ct. App. May 21, 2009) (unreported) (noting that in *Crotteau* "the Wisconsin Supreme Court approved the then-current" civil jury instruction on self-defense, "WIS JI-CIVIL 2006 as an accurate statement of the law for self-defense in a civil action" and that "[t]he current version" of the civil jury instruction on self-defense "is substantially the same as the instruction and supplementary legal principles approved in *Crotteau*".).[6]

---

6.     Wisconsin's current civil jury instruction on self-defense, Wis. JI-CIVIL 2006 (2013) states:

          "Self-defense" is the right to defend one's person by the use of whatever

Determining whether O'Keefe violated Horton's *legal rights* depends on applying Wisconsin law to the evidence presented at trial. See, e.g., *First Weber*, 738 F.3d at 774–75; *Heinrich v. Bagg*, No. 18-CV-1308, 2023 WL 2633738, at *17 (E.D. Wis. Mar. 24, 2023); *O'Gara v. Hunter (In re Hunter)*, 610 B.R. 479, 492–93 (Bankr. M.D.N.C. 2019); *Schnolis v. Kosobud (In re Kosobud)*, No. 08-36581, Adv. No. 09-03041, 2009 WL 2524598, at *5-6 & n.2 (Bankr. S.D. Tex. Aug. 13, 2009). If O'Keefe acted in self-defense, his blows—no matter how damaging—did not violate Horton's legal rights because they were privileged, i.e., constitute "conduct which, under ordinary circumstances, would subject the actor to liability, [but] under particular circumstances does not subject him to such liability."

---

force is reasonably necessary under the circumstances.

If (<u>defendant</u>) reasonably believed that (his) (her) life was in danger or that (he) (she) was likely to suffer bodily harm, then (<u>defendant</u>) had a right to defend (himself) (herself) by the use of force as under the circumstances (he) (she) reasonably believed was necessary. (<u>Defendant</u>), who alleges that (he) (she) acted in self-defense, has the burden of proof to satisfy you by the greater weight of the credible evidence, to a reasonable certainty, that (he) (she) reasonably believed that the use of some force was necessary to prevent injury and also that the amount of force used by (<u>defendant</u>) was reasonable under the circumstances.

A belief may be reasonable even though mistaken. In determining whether the defendant's beliefs were reasonable, the standard is what a person of ordinary intelligence and prudence would have believed in the defendant's position under the circumstances that existed at the time of the alleged offense. The reasonableness of the defendant's beliefs must be determined from the standpoint of the defendant at the time of the defendant's acts and not from the viewpoint of the jury now.

In determining whether the force used by (<u>defendant</u>) was reasonably necessary, you may consider the actions of (<u>plaintiff</u>), the force or threat of force used by (<u>plaintiff</u>), the amount of force used by (<u>defendant</u>), the means or instrument by which the force was applied, as well as the relative strength and size of (<u>plaintiff</u>) and (<u>defendant</u>).

*Comment,* WIS JI-CIV 2006 (quoting RESTATEMENT (SECOND) OF TORTS §10).

Self-defense under Wisconsin civil law requires proof that the defendant "reasonably believed that the use of some force was necessary to prevent injury and also that the amount of force used [ ] was reasonable under the circumstances." Wis. JI-CIVIL 2006. The "reasonableness of the . . . beliefs [of the person claiming self-defense] must be determined from [that person's] standpoint . . . at the time of the . . . acts". *Id.* "A belief may be reasonable even though mistaken." *Id.*

Horton made no meaningful effort to explain why the court should find that O'Keefe's actions were not justifiable self-defense under Wisconsin law. At closing argument Horton recognized that O'Keefe claimed that he struck in self-defense and contended, in the context of addressing §523(a)(6)'s malice element, that O'Keefe could not rely on a theory of self-defense because he had the burden of proof and had not raised that defense in his answer.[7] Horton apparently concluded that this court could find that O'Keefe injured him within the meaning of §523(a)(6) without addressing the

---

7.     After trial O'Keefe, who has defended himself throughout this proceeding without the assistance of counsel, filed a motion for leave to amend his answer accompanied by a proposed amended answer that pleads self-defense. ECF Nos. 62, 64 & 65. He also filed a supporting document that argues, among other things, that Horton has the burden of showing that his conduct was not self-defense, at least under the circumstances here, where Horton has the burden to prove malice and Horton knew or should have known that since the evening of the confrontation, O'Keefe has contended that he acted in self-defense. ECF No. 63, at 3–5. At the trial in this proceeding, evidence relevant to self-defense was presented without objection, and Horton had a fair opportunity both to submit evidence relating to self-defense and to argue the issue at trial. Horton also filed no response to O'Keefe's motion. Because Horton was or should have been aware of O'Keefe's self-defense claim before trial, O'Keefe's request to amend his answer is not unfairly prejudicial. The court concludes that O'Keefe's failure to plead self-defense did not prejudicially affect Horton's trial of the §523(a)(6) issues and that permitting O'Keefe to amend his answer will aid in presenting the merits. O'Keefe, therefore, is permitted to amend his answer after trial to conform his pleading to the evidence, as allowed by Federal Rule of Civil Procedure 15(b) (made applicable here by Federal Rule of Bankruptcy Procedure 7015).

self-defense question, presumably overlooking that establishing an injury for §523(a)(6) purposes requires him to prove that O'Keefe violated his legal rights. *First Weber*, 738 F.3d at 774. This is not altogether surprising. Several courts adjudicating similar claims have presumed the existence of a §523(a)(6) injury before moving on to address the question of self-defense in the context of deciding whether the injury was malicious. See *Mathews*, 452 B.R. at 753–54 (district court decision); *Mathews*, 433 B.R. at 735–36 (bankruptcy court decision); *Mitchem v. House (In re House)*, No. 07-374, Adv. No. 07-50354, 2008 WL 724081, at *1–2 (Bankr. S.D. Ind. Mar. 14, 2008).

But, again, Horton must prove that O'Keefe violated his legal rights to demonstrate "injury" as used in §523(a)(6). If O'Keefe's actions were justifiable self-defense under Wisconsin law, Horton cannot make that showing.

Whether Horton's burden to prove injury entails a burden to disprove O'Keefe's self-defense claim is a knotty issue. Some courts have presumed that if the debtor bears the burden of proving self-defense under state law, the debtor also bears that burden in in the §523(a)(6) context. See *Casciano*, 2016 WL 105926 at *6–7 (remanding "for further proceedings regarding the element of 'malicious injury' under §523(a)(6)" for the court to analyze whether the debtor met his burden to prove self-defense). That approach may be correct in the context of §523(a)(6)'s injury element: the creditor's proof of unpermitted hitting establishes a violation of a legal right, unless, under the applicable state-law principles, including its assignment of the burden of proof, the debtor shows that he acted in self-defense. The court will therefore presume without deciding that unless O'Keefe proves he acted in self-defense under Wisconsin law by a

preponderance of the evidence, Horton has met his burden of proving injury.[8] *Rinehart v. Whitehead*, 24 N.W. 401, 403 (Wis. 1885) (person claiming the self-defense privilege has the burden to prove that it applies).

The evidence shows that O'Keefe struck Horton in the face or head three times—inflicting serious physical damage—after a series of events culminating in Horton kicking at O'Keefe. O'Keefe's strikes were privileged self-defense if he reasonably believed that the use of force was necessary to prevent injury and he used force that, under the circumstances, was reasonable. Wis. JI–CIVIL 2006 (2013). "The reasonableness of the belief is determined by the standard of a person of ordinary intelligence and prudence under all the circumstances existing at the time of the offense, including the right of such person to act upon appearances." *Maichle*, 230 N.W.2d at 793.

At the time of the events, O'Keefe was at the Property, more than 100 miles from his home, to collect purchases he had made through an online auction. Horton arrived near dusk and used his vehicle to block O'Keefe's truck, preventing him from leaving. Horton then exited his vehicle and confronted O'Keefe, aggressively accusing him of being a thief and telling him that others were on their way to deal with his supposed illegal acts. O'Keefe credibly testified that Horton's conduct—including these acts and his agitated manner—made O'Keefe concerned for his wellbeing. Horton's bravado led O'Keefe to believe that Horton was either a skilled fighter or armed, and O'Keefe felt that the terrain left him exposed to other assailants. O'Keefe tried to deescalate the situation. But when Horton began reaching into O'Keefe's truck bed and then moved to kick O'Keefe, the anxiety invoking circumstances combined with O'Keefe's lack of

---

8.    The court makes the findings of fact described in this section addressing §523(a)(6)'s injury element under the presumption that O'Keefe bears the burden of proving self-defense.

immediate access to his phone or other means of assistance, led O'Keefe to reasonably believe that the use of force was necessary to protect himself from injury.

Whether O'Keefe proved that the amount of force he used was reasonable under the circumstances is a closer question. O'Keefe countered Horton's kick with three blows to the head that severely wounded Horton. The severity of the harm is some evidence that O'Keefe used excessive force. And, in hindsight, O'Keefe seems to have overestimated Horton: Horton was unarmed and an unskilled fighter.

But the reasonableness of O'Keefe's response must be decided based on the circumstances O'Keefe found himself in at the time. He need prove only that he "reasonably believed . . . that the amount of force [he] used . . . was reasonable under the circumstances." Wis. JI–CIVIL 2006.

O'Keefe, principally through his testimony, proved by a preponderance of the evidence that he reasonably thought his three successive blows were a reasonable response to Horton's aggression. Horton started the confrontation and then escalated it by reaching into O'Keefe's truck and then kicking at O'Keefe. Horton's actions—rushing down the access road, blocking O'Keefe's ability to leave, accusing him of theft, and threatening the arrival of reinforcements—combined to constitute a serious potential threat, or so O'Keefe reasonably believed. Horton initiated the physical exchange—kicking at O'Keefe—after O'Keefe confronted him about reaching into the bed of O'Keefe's pickup. Under these circumstances, a "person of ordinary intelligence and prudence" in that situation at that moment—not knowing whether Horton was armed or otherwise dangerous—would have believed that O'Keefe's three-strike

response was reasonable.[9] *Maichle*, 230 N.W.2d at 793.

Because the evidence shows that O'Keefe struck Horton in self-defense under Wisconsin civil law, Horton failed to prove that O'Keefe caused him an injury within the meaning of §523(a)(6).[10]

2

*Malicious.* Even if Horton had proved a §523(a)(6) injury (that is, even if O'Keefe had not demonstrated that his punches were privileged acts of self-defense), Horton would also have to prove that O'Keefe injured him maliciously. As explained above, to demonstrate that an injury is malicious, Horton must prove O'Keefe "acted in conscious disregard of [his] duties or without just cause or excuse". *First Weber*, 738 F.3d at 774 (internal quotation omitted).

---

9.  O'Keefe did not lose the right to claim self-defense by moving between Horton and O'Keefe's truck. See *Root v. Saul*, 718 N.W.2d 197, 204 (Wis. Ct. App. 2006) ("a defendant who is the initial aggressor can lose the right to claim self-defense, unless the defendant abandons the fight and gives notice to his adversary that he has done so."). Considering and weighing all the evidence, Horton, rather than O'Keefe, was the aggressor: Horton rushed to the scene and used his vehicle to block O'Keefe's exit, he repeatedly accused O'Keefe of being a thief, he reached into the bed of O'Keefe's truck, and then he kicked at O'Keefe.

10. As an aside, some courts have concluded in addressing §523(a)(6)'s willful requirement that intentionally thrown punches result in willful injuries, even when the debtor claims to have acted in self-defense. See *Mathews*, 433 B.R. at 734–35 (bankruptcy court); *Kleman v. Taylor (In re Taylor)*, 322 B.R. at 309 ("even under the higher standard espoused in *Geiger*, [ ] the Defendant's actions were, in fact, 'willful' based upon the common sense notion that when one physically hits another with enough force to break another's jaw, an alternative, but plausible explanation is all but impossible to discern."). Doing so, however, depends on equating "injury" with physical harm: "[H]aymakers, like most garden-variety punches to the face, are objectively very likely to cause harm." *Perry v. Judge (In re Judge)*, 630 B.R. 338, 345 (B.A.P. 10th Cir. 2021) (quoting *Berry v. Vollbracht (In re Vollbracht)*, 276 Fed. App'x 360, 362 (5th Cir. 2007) (unpublished)). And, as discussed above, Seventh Circuit precedent forecloses this conclusion by instructing that "injury" means a "violation of another's legal right". *First Weber*, 738 F.3d at 774 (internal quotation omitted). A haymaker thrown in lawful self-defense causes no injury for §523(a)(6) purposes—willful or otherwise.

There is some ambiguity in this standard. Does Horton succeed in proving a malicious injury if he shows that O'Keefe acted in conscious disregard of his duties, *or* that he acted without just cause, *or* that he acted without excuse? Alternatively, does *First Weber*'s test for malice pose a single inquiry: Did O'Keefe injure Horton knowing that he was acting wrongfully—that is, consciously disregarding his duties without having either a just cause or an excuse? This alternative application perhaps better fits the appropriate historic use of the elusive term "malicious." See, e.g., *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934) ("There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one."); cf. *McDonald v. Woodruff*, 16 F. Cas. 49, 50 (C.C.E.D. Ark. 1871) ("Malice, in law, is implied from wrongful and unjustifiable acts, done on purpose or without just or legal excuse."); *Willful and Malicious Injury*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("Under the statutory exception to discharge, damage to another entity (such as a creditor) caused by a debtor intentionally performing a wrongful act—without just cause or excuse—that the debtor knew was certain or substantially certain to cause injury."). But courts in the Seventh Circuit have generally read the precedent to mean that one can prove that an injury is malicious by satisfying any of the three standards—conscious disregard of duty, lack of just cause, or lack of excuse. See *Heyerholm v. Johnson*, No. 23-CV-328, 2024 WL 4240288, at *3 (W.D. Wis. Sept. 19, 2024) ("The court of appeals has more recently affirmed the *First Weber* standard, again using the disjunctive, stating that malicious means that the debtor 'acted in conscious disregard of his duties or without just cause or excuse.'" (first quoting *Calvert*, 913 F.3d at 701, then citing *id.* at 702 (Bucklo, J., dissenting))). This opinion follows the same course.

As mentioned earlier, courts have disagreed about whether state-law self-defense principles should govern an inquiry into whether a debtor acted "in conscious disregard of his duties", "without just cause" or "without excuse". Compare, e.g., *Taylor*, 322 B.R. at 309–10 (federal law governs but courts look to state self-defense law "given the lack of authority, both controlling and persuasive, on the matter of self-defense as it applies to §523(a)(6).") with *Mathews*, 433 B.R. at 735–38 (applying state self-defense law). But whether an injury is "malicious" within the meaning of §523(a)(6) is ultimately a federal-law question (even if state law principles guide the answer), and Horton (the creditor), not O'Keefe (the debtor), bears the burden to prove that the injury was malicious—that is, resulted from a conscious disregard of duty or was without just cause or excuse. *Grogan*, 498 U.S. at 287.

Only the first of these three—conscious disregard of *duties*—requires direct application of nonbankruptcy law. Again, O'Keefe's duties to Horton (if any) arose under Wisconsin law. And this opinion's finding that O'Keefe did not violate a duty under Wisconsin law because he proved he acted in self-defense means that O'Keefe did not act in conscious disregard of his duties. But, even if the court were to presume that O'Keefe failed to meet his burden to prove that his conduct was privileged under Wisconsin law, Horton failed to prove by a preponderance of the evidence that O'Keefe *consciously* disregarded his duties to Horton. The evidence presented does not prove, for example, that O'Keefe used force he believed unnecessary or excessive.

Horton also failed to prove that O'Keefe lacked just cause or excuse in striking Horton. Under the circumstances here, the existence of a just cause or excuse seems most naturally to depend on general common law self-defense principles that serve to inform the meaning of "malicious" as a matter of federal statutory law. *Casciano*, 2016

WL 105926, at *6. But the sources to which one might turn in considering whether acts taken in self-defense satisfy federal-law notions of "just cause" or "excuse" in the application of §523(a)(6)'s malicious-injury requirement differ little from Wisconsin's common law of self-defense. See, e.g., RESTATEMENT (FIRST) OF TORTS §63 (AM. L. INST. 1934); RESTATEMENT (SECOND) OF TORTS §63 (AM. L. INST. 1965). So, the finding that O'Keefe acted in self-defense under Wisconsin law also entails that Horton did not prove O'Keefe struck him without just cause or excuse.

What is more, even if O'Keefe had failed to prove he acted in self-defense, that is, even if he failed to prove that Horton threatened physical harm or that the force used was reasonable, Horton failed to prove that O'Keefe did *not* act in self-defense. As explained above, O'Keefe reasonably thought that Horton was a threat and that the counterstrikes were a reasonable response to that threat. Horton did not prove by a preponderance of the evidence either that O'Keefe *lacked* a reasonable belief that his conduct was necessary to avoid physical harm or a belief that the force used was *not* reasonable. As a result, Horton failed to prove that O'Keefe consciously disregarded his duties or acted without just cause or excuse. In sum, Horton did not prove that O'Keefe injured him maliciously.

III

For these reasons, the court finds and concludes that (a) O'Keefe acted in self-defense and not in violation of Horton's legal rights and (b) Horton failed to prove that O'Keefe acted in conscious disregard of his legal duties, or without just cause or excuse. Horton thus failed to prove O'Keefe maliciously injured him within the meaning of

§523(a)(6). Consequently, any debt that O'Keefe owes Horton is dischargeable.[11]

 IT IS THEREFORE ORDERED that (a) defendant O'Keefe's request to amend his answer to plead self-defense is granted, (b) plaintiff Horton is entitled to no relief in this adversary proceeding, and (c) the clerk of court is directed to enter judgment for defendant O'Keefe.

#####

---

11. The Seventh Circuit reasoned in *Jendusa-Nicolai v. Larsen* that "all courts would agree that a willful and malicious injury, precluding discharge in bankruptcy of the debt created by the injury, is one that the injurer inflicted knowing he had no legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act." 677 F.3d 321, 324 (7th Cir. 2012). Horton did not make this showing. For the reasons stated above, he did not prove that O'Keefe lacked a legal justification, that O'Keefe desired to inflict injury, or that an injury—in the sense of a violation of a legal right—was highly likely to result from his conduct.